**Willard R. RUSHING and Patricia Ann Rushing Plaintiffs**

v.

**KANSAS CITY SOUTHERN RAILWAY COMPANY Defendant**

**No. CIV.A. 99–CV–185.**

United States District Court, S.D. Mississippi, Jackson Division.

May 22, 2001.

Thomas W. Prewitt, Thomas W. Prewitt, Attorney, Ridgeland, for Willard R. Rushing, Patricia Ann Rushing, plaintiffs.

Charles E. Ross, Chad M. Knight, Wise, Carter, Child & Caraway, Jackson, for Kansas City Southern Railway Company, defendants.

### OPINION AND ORDER

BARBOUR, District Judge.

This cause is before the Court on the Motion of the Defendant to Dismiss for lack of federal subject matter jurisdiction. In the alternative, the Defendant seeks partial summary judgment on the Plaintiffs' common law claim of nuisance. The

Court has considered the motion, response, rebuttal, attachments to each and supporting and opposing authority and finds that the Motion to Dismiss should be granted in part and denied in part.

## I. Factual Background and Procedural History

The subject of this cause of action relates to the operation by the Defendant, Kansas City Southern Railway Company ("Kansas City") of its switching station located in close proximity to the Plaintiffs' home at 1845 Twin Pine Drive, Rankin County, Mississippi. On June 4, 1997, the Plaintiffs filed a lawsuit in the Circuit Court of Rankin County, Mississippi, (Rushing I) alleging that the Defendant was operating its trains and switching yard in a manner which created a private nuisance. *See* Motion to Dismiss, Exhibit B. Specifically, the acts taken by the Defendant about which the Plaintiffs complain include: (1) the creation of "unbearable levels of noise caused by trains switching, brakes screeching, and horn blowing at all hours of the day and night," (2) the creation of vibrations from railroad cars which are allowed "to roll down an incline and collide with other cars at the lower end," and (3) damage to their property because of pooling rainwater they allege results from an approximately twelve-foot high earthen berm that was erected by the Defendant adjacent to their property.[1] Through their complaint, the Plaintiffs seek $70,000.00 in compensatory damages related to the diminution in value of their real property, $250,000.00 in special damages related to the mental anguish, inconvenience, and medical bills they have incurred, and (3) $20,000.00 for each Plaintiff related to the loss of conjugal rights secondary to the alleged nuisance.

The Defendant timely removed the case to this Court. For the purpose of diversity analysis, the Plaintiffs are citizens of the State of Mississippi, the Defendant is a corporate citizen of the State of Missouri, and the amount in controversy exceeds the jurisdictional amount. The Court, therefore, has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 unless preempted under federal law.

The Defendant, in Rushing I, moved for partial summary judgment alleging that the Plaintiffs' state law claim of nuisance, as it related to the level of noise emanating from the switch yard, was preempted under the Noise Control Act of 1972, codified at 42 U.S.C. § 4916 *et seq.* The decision of this Court which granted partial summary judgment to the Defendant was reversed by the United States Court of Appeals for the Fifth Circuit. *See Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496 (5th Cir. 1999). The case was then remanded back to this Court for further proceedings.

While Rushing I was pending appeal, the Plaintiffs filed a second lawsuit in the Chancery Court of Rankin County, Mississippi, on February 23, 1999 (Rushing II). *See* Motion to Dismiss, Exhibit B. In their second complaint, the Plaintiffs allege that the Defendant negligently operated its switch yard by: (1) conducting switching activities primarily at night thereby disrupting their ability to sleep, (2) allowing train engineers to blow the train horns and whistles at unnecessary high levels and for long intervals when backing-up in the switch yard, (3) switching railroad cars by rolling them down an incline where they collide with other cars, (4) operating its switching operations in a manner which causes the brakes on the train to squeal and screech unnecessarily, and (5) allowing

---

1. The earthen berm was designed and erected to reflect and/or absorb the noise emissions originating from the switch yard.

railroad cars to crash together during switch yard operations. The Plaintiffs allege that these negligent acts have created unbearable noise levels and vibrations which in turn have caused damage to their real property and resulted in physical, mental and emotional health problems. The Plaintiffs also again allege that the Defendant was negligent in the manner in which it constructed the earthen berm adjacent to their property. Through their second complaint, the Plaintiffs seek compensatory damages in the amount of $60,000.00, and injunctive relief. The Plaintiffs seek to have the Defendant enjoined from operating its switch yard in a manner that produces noise levels exceeding the permissible limits. The Plaintiffs also seek a court order requiring the Defendant to (1) eliminate the damaging vibrations caused by operations at the switch yard and (2) correct the conditions on its property, specifically the earthen berm, that have altered the natural flow and drainage of rainwater from their property.

The Defendant removed Rushing II to this Court and, by an Order of April 18, 2000, Rushing I and Rushing II were consolidated. The Defendant has now moved to have the consolidated action dismissed for lack of federal subject matter jurisdiction. The Defendant contends that under the Interstate Commerce Commission Termination Act ("ICCTA"), codified at 49 U.S.C. § 10101 *et seq.*, the Surface Transportation Board ("STB") has exclusive jurisdiction to hear claims related to switching operations conducted by railroads. The Defendant also argues that in the event this Court has concurrent jurisdiction with the STB on the Plaintiffs' claims, the matter should nevertheless be referred to the STB under the doctrine of primary jurisdiction.

## II. Analysis

Pursuant to 49 U.S.C. § 10501(b)(2):

The jurisdiction of the [STB] over—

the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

The issue before the Court is whether Congress intended the preemptive effect of this statute to apply to the case *sub judice.*

■ Under the basic principles of preemption, "the Laws of the United States ... shall be the Supreme Law of the Land ... any Thing in the Constitution or the Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Federal law displaces state law when (1) Congress has acted to expressly preempt state or local law, (2) the intent of Congress to preempt state or local law may be inferred from the existence of a pervasive regulatory scheme, or (3) state or local law conflicts with federal law or otherwise frustrates the accomplishment of a federal objective. *See Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 n. 1 (5th Cir.1995) (citing *Hillsborough County, Fla. v. Automated Med. Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)).

■ It is well settled that Congress, under the Commerce Clause, has the authority to regulate railroads. *See e.g. Pittsburgh & Lake Erie RR v. Railway Labor Executives Ass'n,* 491 U.S. 490, 510, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989); *Houston E & W Tex. Ry. v. United States,* 234 U.S. 342, 350–52, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Further, "the [United States] Supreme Court repeatedly has rec-

ognized the preclusive effect of federal legislation" in the area of railroad regulation. *City of Auburn v. United States*, 154 F.3d 1025, 1029 (9th Cir.1998) (citations omitted). Congress initially asserted federal authority over the railroad industry by enacting the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which, as amended, continues to govern federal regulation of that industry, and has been recognized as "among the most pervasive and comprehensive of federal regulatory schemes." *Id.* (quoting *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981)). Federal regulation of the railroad industry was expanded in 1995 when Congress enacted the ICCTA. *See* H.R. Rep. No. 104–311, at 95–96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 807–08 (indicating the Congress enacted changes to the jurisdictional provision of the ICCTA "to reflect the direct and complete preemption of State economic regulation of railroads. The changes include extending exclusive Federal jurisdiction to matters relating to spur, industrial, team, switching or side tracks formerly reserved for State jurisdiction.").

Under the principles of federalism, preemption does not lie unless preemption is "the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The United States Supreme Court has found that "in the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as exclusive." *Burlington N. R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987). Therefore, the "starting point in statutory interpretation is the language [of the statute] itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Statutory interpretation is guided by two principles:

First, there is a presumption, especially in fields where states have traditionally reigned, that "the historic police powers of the State were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress." This approach comports with notions of federalism and the historic place held by the states in the regulation of health and safety. This principle gives way, however, where there has been a history of significant federal presence.

Second, the analysis of a statute's preemptive scope is guided by the principle that "the purpose of Congress is the ultimate touchstone" in every preemption case.

*Florida E. Coast Ry. Co. v. City of W. Palm Beach*, 110 F.Supp.2d 1367, 1376 (S.D.Fla.2000).

Under the principles of preemption, the plain language used by Congress when it enacted the ICCTA clearly provides that the STB has exclusive jurisdiction over "the construction, acquisition or operation ... of ... switching, or side tracks, or facilities." 49 U.S.C. § 10501(b)(2). Further, the statute expressly provides that "the remedies provided under this part with respect to regulation of railroad transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* As such, the Court finds that the clear and manifest purpose of Congress when it enacted the ICCTA was to place certain areas of railroad regulation within the exclusive jurisdiction of the STB and to preempt remedies otherwise provided under federal or state law. Second, the purpose of Congress in regulating the railroad industry is "to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required," "to

ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers," and "to operate transportation facilities and equipment without detriment to the public health and safety." 49 U.S.C. § 10101(2), (4) and (8). It appears, therefore, that the goal of Congress in enacting the ICCTA, was to foster competition while deregulating the railroad industry. *See e.g. CSX Transp., Inc. v. Georgia Public Serv. Comm'n,* 944 F.Supp. 1573, 1583 (N.D.Ga.1996) (holding that "[b]y preempting state regulation of railroad operations, and granting exclusive jurisdiction over the regulation of almost all aspects of railroad operations to the STB, Congress removes the ability of states to frustrate its policy of deregulating and reviving the railroad industry.").

■ Accordingly, the Court finds that Congress, under the ICCTA, explicitly granted the STB exclusive jurisdiction over claims involving railroad operations, except as otherwise provided under the ICCTA. *See City of Auburn,* 154 F.3d at 1031 (holding "[w]e believe the congressional intent to preempt this kind of state and local regulation of railroad lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it."); *Georgia Public Serv. Comm'n,* 944 F.Supp. at 1581 (holding "[i]t is difficult to imagine a broader statement of Congress' intent to preempt regulatory authority over railroad operations."). *See also Florida E. Coast Ry.,* 110 F.Supp.2d at 1373–74 (holding "[i]ndeed, [the legislative history of the ICCTA] makes plain Congress's intent to shield railroads from state regulation while at the same time lessening federal regulation of the railroad industry"):

Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive. Any other construction would undermine the uniformity of Federal standards and risk balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.

(quoting H.R.Rep. No. 104–311, at 96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 808).

The Court finds that some of the Plaintiffs' claims under Mississippi common law are preempted under the ICCTA. First, although the relevant Mississippi laws of negligence and nuisance may be construed as a exercise of the police power of the state to safeguard the health and safety of its citizens, the Plaintiffs are attempting to use these laws to impose regulations on the Defendant regarding the manner in which it operates its switch yard thereby potentially interfering with interstate rail operations. *See Borough of Riverdale,* 1999 WL 715272 *5 (STB Sept. 9, 1999) (finding that "state or local regulation is permissible where it does not interfere with interstate rail operations."). Additionally, to the extent that these laws could provide local authorities with the power to regulate the periods of time in which a railroad company was permitted to operate its switching activities, and the manner in which those activities could otherwise be conducted, the state laws would impose an impermissible economic regulation on the railroad industry. *See CSX Transp., Inc. v. City of Plymouth,* 92 F.Supp.2d 643, 658 (E.D.Mich.2000) (discussing findings of several courts that have found that the ICCTA "preempts state law regulation of railroads in an economic sense.") (citations omitted); *Burlington N. Santa Fe Corp. v. Anderson,* 959 F.Supp. 1288, 1296 (D.Mont.1997) (holding that the "statutory language and accompanying legislative record [of the ICCTA] evidence Congress'

clear and manifest intent to occupy the entire field of economic regulation of railroad transportation.").

■ The Plaintiffs, however, argue that the jurisdiction of the STB over this matter is not exclusive, and that this Court has concurrent jurisdiction to hear this case. In support of their argument, the Plaintiffs rely on *Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.*, 215 F.3d 195 (1st Cir.2000). In *Pejepscot*, the United States Court of Appeals for the First Circuit held that the jurisdiction of the STB was not exclusive for claims brought pursuant to the ICCTA, specifically under 49 U.S.C. § 11101(a), because of the provisions found at 49 U.S.C. § 11704(c). Title 49 U.S.C. § 11704 provides, in relevant part:

> (b) A rail carrier providing transportation subject to the jurisdiction of the [STB] under this part is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part. A rail carrier providing transportation subject to the jurisdiction of the [STB] under this part is liable to a person for amounts charged that exceed the applicable rate for the transportation.
>
> (c)(1) A person may file a complaint with the [STB] under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier providing transportation subject to the jurisdiction of the [STB] under this part.

The First Circuit found, based the legislative and judicial history of the ICCTA and its predecessor the Interstate Commerce Act, that a federal court could properly exercise jurisdiction over a claim brought pursuant to the ICCTA. *Id.* at 205.

This Court, however, finds that *Pejepscot* is distinguishable from the case *sub judice*. Unlike the plaintiff in *Pejepscot* which alleged a claim under the ICCTA,

specifically that the Defendant violated 49 U.S.C. § 11101, the Plaintiffs in the present case have not alleged any cause of action arising under the ICCTA. To that extent, the Court finds that the provisions of 49 U.S.C. § 11704(b) and (c)(1) are not applicable as the combined reading of those statutes appears to limit jurisdiction of the federal courts to those cases for "damages sustained by a person as a result of an act or omission of that carrier in violation" of the ICCTA.

■ The record in the case *sub judice* shows that the Plaintiffs seek to use Mississippi state nuisance and negligence law to enjoin the Defendant from operating its switch yard in the manner it currently employs in an attempt to eliminate the damaging vibrations about which they complain. The "damaging vibrations" appear to be caused by techniques used by the Defendant to switch railroad cars in the switch yard. The Court finds that to the extent the Plaintiffs seek to use state common law to regulate the manner in which the Defendant conducts operations at its switch yard, which in turn would result in an economic impact on the Defendant, the state law has been preempted by the ICCTA which vests exclusive jurisdiction in the STB over such matters.

■ The Plaintiffs also seek to use Mississippi state nuisance and negligence law to enjoin the Defendant from operating its switch yard in a manner which causes the levels of noise emanating therefrom to exceed permissible levels. As recognized by the Fifth Circuit, "[a] state may employ or allow a common law action for damages ... only to enforce federal regulations or to regulate aspects of railroads and switching over which the state has discretionary authority." *Rushing*, 185 F.3d at 511. The Court finds, for the reasons discussed above, that to the extent the Plaintiffs seek to use state law to control noise production by regulating the

manner in which the Defendant operates its switch yard, for example by restricting the hours at which time it may conduct switching and whistle-blowing activities, controlling the number of trains engaged in switching operations at any given time, and by requiring that the Defendant employ different techniques when braking its trains, all of which would result in an economic impact on the Defendant, the state law has been preempted by the ICCTA which vests exclusive jurisdiction in the STB over such matters.

 Finally, the Plaintiffs seek to use Mississippi state nuisance and negligence law to require the Defendant to remedy the pooling of rainwater on their property, which they allege resulted from the erection of an earthen berm by the Defendant. The Defendant admits that the berm was constructed to reflect and absorb noise emissions originating from the rail yard. As such, the Court finds that the design/construction of the berm does not directly relate to the manner in which the Defendant conducts its switching activities. Additionally, the Court finds that an order by the Court directing the Defendant to compensate and correct drainage problems resulting from the construction of the berm would not implicate the type of economic regulation Congress was attempting to prescribe when it enacted the ICCTA. Accordingly, the Court finds that it has subject matter jurisdiction to hear the Plaintiffs' state law nuisance and negligence claims that relate to the design and/or construction of the earthen berm by the Defendant and the alleged damages resulting therefrom. The Court, therefore, finds that the Motion of the Defendant to Dismiss, as that motion relates to the Plaintiffs' state law claims of nuisance and negligence arising from the level of noise and/or vibration emanating from the switch yard is well taken and should be granted, and that those claims should be dismissed for lack of federal subject matter jurisdiction. To the extent the Motion of the Defendant seeks to dismiss the claims of the Plaintiffs that arise from the erection of the earthen berm adjacent to their property, the Court finds that the motion is not well taken and should be denied.

### III. Conclusion

For the foregoing reasons:

IT IS THEREFORE ORDERED that the Motion of the Defendant to Dismiss [79–1] is hereby granted in part and denied in part. The Plaintiffs' nuisance and negligence claims that relate to the levels of noise and vibration emanating from the switch yard operated by the Defendant are hereby dismissed for lack of federal subject matter jurisdiction. A trial on the merits of the Plaintiffs' nuisance and negligence claims that relate to the design/erection of the earthen berm by the Defendant will proceed to trial as previously scheduled.

IT IS FURTHER ORDERED that the Motion of the Defendant for Partial Summary Judgment [79–2] is hereby denied.